IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 9, 2000 Session

## STATE OF TENNESSEE v. CHARLES THOMPSON and VERICO JACKSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 96-11968, 97-05622      Chris Craft, Judge**

-----

**No. W1998-00351-CCA-R10-CD  - Filed August 9, 2001**

-----

On October 31, 1996, a Shelby County Grand Jury indicted Charles Thompson and Verico Jackson for first-degree murder. Later, the defendants were also indicted for conspiracy to commit murder. Following a jury trial, the defendants were convicted on both counts. The trial court dismissed the conspiracy charges, and, following a sentencing hearing, sentenced Charles Thompson to life without parole and sentenced Verico Jackson to life. On appeal, both defendants claim (1) that the evidence was insufficient to sustain the verdicts; (2) that the trial court should have severed the defendants' trials; (3) that the trial court erred by shackling defense witnesses and/or providing extra security in the courtroom; (4) that the trial court erroneously excluded the victim's "dying declaration"; (5) that the trial court erroneously excluded evidence that people other than the defendants had recently threatened the victim; and (6) that the trial court erroneously overruled a motion for mistrial after a witness testified that Defendant Thompson had previously ordered other murders. Additionally, Defendant Thompson claims (1) that the trial court erroneously allowed the state to use exhibits that had been used in a previous trial of a codefendant; (2) that the trial court erroneously overruled a motion for mistrial after an attorney mentioned the trial of a codefendant in violation of a court order; (3) that Defendant Jackson's attorney had a conflict of interest that prejudiced Defendant Thompson; (4) that the trial court erroneously excluded the prior inconsistent statements of a witness; (5) that the trial court erroneously excluded evidence of a witness's reputation for truthfulness; (6) that the trial court erroneously denied Defendant Thompson's request for a special jury instruction; and (7) that, at sentencing, the trial court erroneously allowed the state to introduce prejudicial evidence of prior bad acts. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ, joined.

Paula Skahan and Gerald Skahan, Memphis, Tennessee, for appellant, Charles Thompson

James Ball and Joseph Ozment, Memphis, Tennessee, for appellant, Verico Jackson.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; Jerry Harris; Jerry Kitchen, Assistant District Attorneys; for appellee, State of Tennessee.

**OPINION**

**Factual Background**

In 1996, Charles Thompson and Verico Jackson were both high-ranking members of a gang called the "Traveling Vice Lords." On April 19, 1996, Charles Thompson was incarcerated in the Shelby County Justice Center where he had a verbal altercation with a Sergeant Dedrick Taylor, a Justice Center employee. Following that altercation, Charles Thompson telephoned Verico Jackson at a local apartment and told Jackson that he wanted Sergeant Taylor killed and that he wanted to see news of the killing on television the next morning. Jackson then related that conversation to other members of the gang who were present in the apartment. Jackson and the other members of the gang armed themselves and left the apartment. They walked toward the street on which Sergeant Taylor and his wife lived. Jackson then told the other gang members to kill Sergeant Taylor. Shortly thereafter Sergeant Taylor pulled into his driveway where he was shot several times. His wife heard gunshots, but did not see who shot Sergeant Taylor. Sergeant Taylor died from the gunshot wounds.

Margaretta Dotson, a woman who was with the gang members earlier in the evening, heard gunshots coming from the area of Sergeant Taylor's house. Immediately after hearing the shots, she saw all of the gang members run and jump into a car and drive away. She then returned to the apartment that Charles Thompson had phoned earlier; there she found Jackson and the other gang members. They all watched the local news, and saw a report about the shooting of Sergeant Taylor. When the news report aired, Jackson and the other gang members celebrated and made "gang-signs" to one another.

The defendants were charged with first-degree murder and conspiracy to commit first-degree murder. Following a jury trial, both defendants were convicted on both counts. The court dismissed the conspiracy charges on double jeopardy grounds. After a sentencing hearing, Defendant Thompson was sentenced to life without the possibility of parole and Defendant Jackson was sentenced to life.

**Sufficiency**

First, both appellants claim that the evidence was insufficient to support their convictions. When an appellant challenges the sufficiency of the evidence, this court is obliged to review that challenge according to certain well-settled principles. A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the

testimony in favor of the State.  State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).  Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  Hence, on appeal, the burden of proof rests with the appellant to demonstrate the insufficiency of the convicting evidence.  Id.

On appeal, the state is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Where the sufficiency of the evidence is contested, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt.  State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992); Tenn. R. App. P. 13(e).  In conducting our evaluation of the convicting evidence, this Court is precluded from reweighing or reconsidering the evidence.  State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996).  Moreover, this Court may not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence."  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

In this case, the defendants were found guilty of being criminally responsible for the first-degree murder of Dedrick Taylor.  "A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."  Tenn. Code Ann. § 39-11-402(2).  First degree murder is "[a] premeditated and intentional killing of another." Tenn. Code. Ann. § 39-13-202(a)(1).

The evidence in this case was sufficient to support an inference that Charles Thompson ordered Verico Jackson to kill Sergeant Taylor and that Verico Jackson carried out that order through subordinate members of the Traveling Vice Lords.  Charles Taylor, an inmate, testified that Sergeant Taylor and Charles Thompson had a verbal altercation.  He further testified that he heard Thompson telephone someone and ask for Verico Jackson.  Mr. Taylor overheard Charles Thompson say that he wanted Sergeant Taylor killed and that he (Charles Thompson) wanted to see evidence of the killing on the news the next morning.  Margaretta Dotson testified that she was visiting an apartment where Verico Jackson was on April 19, 1996 and that Jackson got a phone call between 7:00 and 7:30 that evening.  Jackson took the phone in another room to take the call. After Jackson got off the phone, he and several other gang members in the apartment began loading weapons.  Robert Meyer, a specialist in charge of the inmate telephone system, testified that a phone call was made from prison "pod" 4-f to the apartment in question at 7:32 p.m.  Charles Golden, a member of the Traveling Vice Lords, testified that he was at the apartment with Jackson the night of the crime.  He said that Jackson told him (Golden) about the altercation between Thompson and the victim and that "no one could do that to his chief."  Golden said that when the other gang members said that they should kill the victim, Jackson replied "[T]hat's what we gonna do."  Golden, Jackson, and two other men walked to a local night club nearby.  Jackson stayed in the club, while Golden and the two other men found and fatally shot Sergeant Taylor.  Mr. Golden testified that he shot a .38 caliber that night.  Alphonso Fleming testified that, approximately April 25th or 26th, Charles Golden asked him to hold a .38 caliber gun.  Mr. Fleming hid the gun in a closet until police came and confiscated it.  Tommy Heflin, a TBI firearms identification expert, testified that all nineteen shell casings recovered at the scene of the murder were fired from the weapon discovered in Mr. Fleming's closet and that

several bullet fragments could have been fired from that gun. Finally, Marcus Daniels, another gang member, testified that Charles Thompson was a ruling member of the gang, and that others had to abide by his orders. The evidence was clearly sufficient to support the jury's verdict.

Jackson also claims, however, that the evidence was insufficient because all of the evidence against Jackson was uncorroborated accomplice testimony. Specifically, he claims that Charles Golden and Charles Taylor were both accomplices and that neither's testimony was corroborated in crucial respects. "In Tennessee, it is well-settled that a defendant cannot be convicted on the uncorroborated testimony of an accomplice." State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999)(citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). As the Tennessee Supreme Court has noted, however,

> [t]his corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

Bigbee, 885 S.W.2d at 803. Thus, "only slight circumstances are required to corroborate an accomplice's testimony." State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997); see also Heflin, 15 S.W.3d at 524. Whether an accomplice's testimony has been sufficiently corroborated is a jury question. Bigbee, 885 S.W.2d at 803.

Initially, we are not convinced that Charles Taylor was an accomplice.[1] In any event, we find that the testimony of Mr. Taylor and Mr. Golden was sufficiently corroborated by the testimony of Margaretta Dodson, Robert Meyer and Tom Maupin. Ms. Dodson testified that she was with Mr. Jackson, Charles Golden, Thomas Cummings, Rory Haywood and Hubert Bond on April 19, 1996. At approximately 7:00 p.m. or 7:30 p.m., Mr. Jackson received a phone call. He took the phone into a bedroom in the apartment and motioned for Mr. Golden, Mr. Cummings and Mr. Haywood to join him in the bedroom. Ms. Dodson testified that she and Mr. Bond stepped outside for a moment. When she stepped back inside, the four other men were loading weapons. After that, Ms. Dodson,

---

[1]Contrary to Mr. Jackson's brief, Mr. Taylor's testimony did not indicate that he was present when Mr. Thompson planned the murder. Furthermore, although Mr. Taylor testified that he acted as "security" for Mr. Thompson when Mr. Thompson phoned Mr. Jackson, Mr. Taylor merely overheard Mr. Thompson order Mr. Jackson to kill Sergeant Taylor. Standing alone, this evidence does not clearly indicate that Mr. Taylor was an accomplice. An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime. State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997). "A common test is whether the alleged accomplice could have been indicted for the offense." State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). In this case, there was no evidence that Mr. Taylor knew about the murder until after Mr. Thompson had ordered it. Nor was there any testimony that Mr. Taylor provided security in order to proceed with the plot to kill Sergeant Taylor. See State v. Ladonte Montez Smith, Joe Davis Martin, and Shaun Fly Smith, No.M199700087CCAR3CD, 1999 WL 1210813, *9 (Tenn. Crim. App. at Nashville, Dec. 17, 1999).

Mr. Bonds, and the others left the apartment. Ms. Dodson told the jury that she overheard Mr. Jackson tell Mr. Golden that they were "fixing to go over here and take care of their business." Verico Jackson went into a local bar, but the others remained outside. At some point, Rory Haywood told Ms. Dodson to tell them when it was 10:00 p.m. Before Ms. Dodson could tell them it was 10:00, however, Mr. Golden, Mr. Cummings and Mr. Haywood left on foot toward the victim's house. Mr. Bonds also left, but he went in another direction. After that, Ms. Dodson started walking toward her friend's house when she heard several gunshots. Following the gunshots, Ms. Dodson saw Mr. Golden, Mr. Cummings and Mr. Haywood all running from the direction of the shots. They all jumped in Mr. Cummings car, and Verico Jackson jumped in with them. The four men drove back to the apartment, while Ms. Dodson and Mr. Bonds walked back to the apartment. Some time after they all returned to the apartment, the local television news reported that Sergeant Taylor had been shot. Ms. Dodson testified that when the men in the apartment heard the news, they all began to celebrate, and Mr. Jackson told Mr. Golden, Mr. Cummings and Mr. Haywood that they "took care of business."

Robert Meyer and Tom Maupin also corroborated the testimony of Charles Golden and Charles Taylor. Robert Meyer, a telecommunications consultant working for Shelby County, testified that several telephone calls were made from Charles Thompson's prison pod to a certain telephone number in Shelby County on the day of the murder, including a fifteen-minute call made at 7:32 p.m. Tom Maupin, a Bell South employee, verified that the telephone number that Mr. Maupin referred to was the apartment that Ms. Dodson and Mr. Golden had testified about, and where Verico Jackson took the call. In sum, the testimony of Charles Golden and Charles Taylor was well-corroborated by other testimony in this case.

This issue is without merit.

## Severance

Next, both defendants claim that the trial court should have tried each defendant separately. Jackson has waived this issue, because he did not raise the issue prior to trial or base his motion on a ground not previously known. Rule 14 of the Tennessee Rules of Criminal Procedure provides, in pertinent part, "[A] defendant's motion for severance of offenses or defendants must be made before trial, except that a motion for severance may be made before or at the close of all evidence if based upon a ground not previously known. *Severance is waived if the motion is not made at the appropriate time.*" Tenn. R. Crim. P. 14(a)(emphasis added).

Because Thompson raised the issue at the appropriate time, we will address the merits of his claim. At a pre-trial hearing, Thompson claimed that severance was necessary because he anticipated that the two defendants' theories of the case were different and that a joint trial would force Thompson to defend against both the state's theory and Jackson's theory. Thompson also feared that if Jackson testified and Thompson did not, the jury would likely infer that Thompson was being evasive. Finally, Thompson was fearful that evidence presented by Jackson might incriminate Thompson.

Whether a severance should be granted is a matter entrusted to the sound discretion of the trial court, and a reviewing court may not disturb the trial court's ruling absent an abuse of discretion that resulted in clear prejudice to the defendant. See State v. Hutchison, 898 S.W.2d 161, 166 (Tenn. 1994). Indeed, the Tennessee Supreme Court recently reminded us that

[t]he state, as well as the persons accused, is entitled to have its rights protected, and when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and the punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants.

State v. Carruthers, 35 S.W.3d 516, 552-53 (Tenn. 2000)(quoting Woodruff v. State, 164 Tenn. 530, 538-39, 51 S.W.2d 843, 845 (1932)).

We find no such prejudice here. According to Thompson's brief, his theory was that he never intended to convey to Jackson that he wanted the victim killed, while Jackson's theory was that he only intended to frighten the victim to impress Thompson. Although the defendants' respective theories of the case were different, Thompson has not shown how this resulted in a vitiation of his rights. See State v. Ensley, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996). Furthermore, a severance need not be granted where the evidence which was introduced could have been admitted against him in a separate trial. State v. Little, 854 S.W.2d 643, 648 (Tenn. Crim. App. 1992). In this case, the state's theory was that Thompson and Jackson engaged in a conspiracy to murder the victim, so the evidence would have been essentially the same whether the defendants were tried separately or together.[2] See Carruthers, 35 S.W.3d at 554 n.39 (Tenn. 2000).

Thompson also complains that he was prejudiced by Jackson's attorney during trial. In a pre-trial order, the trial court prohibited any inquiries about Charles Golden's trial. When Charles Taylor testified, Jackson's attorney asked him about his testimony at Charles Golden's trial. Because this was in violation of a court order, Thompson claims that the trial court erred when it refused to sever the trials or grant a mistrial.

Again, we find no prejudice to Mr. Thompson. As Jackson's attorney was cross-examining Charles Taylor, the following colloquy occurred:

MR. BALL (Jackson's Attorney): Okay. Now you testified on March 18, 1997 in the trial of Charles Golden in this very courtroom, didn't you?

CHARLES TAYLOR: Yes, I did.

THE COURT: We had a hearing, Mr. Ball, about Mr. Golden. He's testified before, but we don't need to get into what all that was about.

Thompson then moved for severance or a mistrial, and the trial court denied the request:

THE COURT: All right. Mr. Ball has not asked anything as far as what's happened with your client that the state didn't or couldn't ask. As far as Mr. Golden's trial, the fact that he was tried or not has nothing – is not prejudicial in the least. We haven't talked about any verdicts or conclusions. And so I'm going to overrule your motion for a mistrial at this time. Also overrule your motion for severance.

---

[2]We also note that Mr. Thompson's fear, i.e., that if Mr. Jackson testified then the jury would believe that Mr. Thompson's refusal to testify implied that he was hiding something, was moot, because Mr. Jackson did not testify.

We agree with the trial court that no prejudice resulted from the mention of Mr. Golden's trial, and that a severance was unnecessary. For the same reasons, we find that the question did not create a "manifest necessity" requiring a mistrial. See State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999)(citations omitted).

This issue is without merit.


**Courtroom Security**

Next, defendant Thompson complains that he was denied a fair trial because the trial court employed extraordinary security measures during the trial. Those measures apparently included posting a metal detector outside the courtroom, posting signs that stated that certain items would not be allowed in the courtroom, and marking the entrance to the courtroom with "police tape." Thompson argues that these extraordinary measures must have created an unfair impression in the jurors' minds that the defendant was dangerous. Additionally, both defendants complain that the trial court erred by allowing several defense witnesses to appear before the jury in shackles, while the state's witnesses appeared without shackles. Finally, Thompson argues that the trial court erred by forcing the defense witnesses to enter the courtroom through a door that led to the jail, while the state's witnesses were allowed to enter the courtroom through the public entrance.

It is well settled that the trial court has broad discretion in controlling the course and conduct of the trial. See Pique v. State, 480 S.W.2d 546, 550-551 (Tenn. Crim. App. 1971). The trial court did not abuse its discretion by providing extraordinary security measures in this case, because it was a reasonable response to the situation that did not prejudice the defendant. The jury knew that several of the witnesses were prison inmates, and several of the witnesses admitted to having been in gangs. See State v. Sutton, 761 S.W.2d 763, 769 (Tenn. 1988)(holding that guard's reaction in reaching for weapons in response to placement of suspected murder weapon, a homemade knife, on defense table within reach of defendant did not deprive defendant of physical indicia of innocence where jury knew defendant, along with coperpetrators, were all inmates incarcerated in prison). We find no evidence that the security measures prejudiced Defendant Thompson.

We are also unconvinced that the trial court's shackling of some defense witnesses prejudiced either defendant. Although both defendants rely on both federal and state case law, all of the Tennessee cases involve situations in which the defendant was shackled, not the defense witnesses. Because shackling a defendant may adversely affect the presumption of the defendant's innocence, the use of restraints on defendants can only be justified as a necessary measure (1) to prevent escape, (2) to protect those present in the courtroom, and (3) to maintain order during the trial. State v. Thompson, 832 S.W.2d 577, 580 (Tenn. Crim. App. 1991)(citations omitted). Unlike a shackled defendant, shackled witnesses do not directly affect the defendant's presumption of innocence. See Kennedy v. Cardwell, 487 F.2d 101, n.5 (6th Cir. 1973). However, because shackling a defense witness may affect the jury's determination of the witness's credibility and thus prejudice the defendant, most courts, including federal courts, use the same standard of review in both defendant shackling and witness shackling cases. Kennedy, 487 F.2d at 105; Williams v. State, 629 P.2d 54 (Alaska 1981); People v. Duran, 16 Cal. 3d 282, 127 Cal. Rptr. 618, 621 n. 4, 545 P.2d 1322, 1325 n. 4 (1976); State v. Jackson, 698 So.2d 1299, 1303 (Fla. Ct. App. 1997); Parker v. State, 567 N.E.2d 105 (Ind. Ct. App. 1991); State v. Coursolle, 255 Minn. 384, 97 N.W.2d 472, 476 (1959);

State v. Simmons, 26 Wash. App. 917, 614 P.2d 1316 (1980); R. P. Davis, Annotation, Right of Accused to Have His Witnesses Free from Handcuffs, Manacles, Shackles, or the Like, 75 A.L.R.2d 762 (1961). Thus, we hold that the decision whether to restrain a defense witness is left to the sound discretion of the trial court, subject to the same considerations that would apply to the physical restraint of a defendant.

The trial court's recognition of the potential prejudice is evident in the following colloquy:

THE COURT: Okay. I think we're all agreed. We need – we need some guidance from all six attorneys. We're going to bring this witness around through – from Division I around the back. When we handle inmates, I don't want, if Mr. Montgomery and Mr. Carruthers are here, I would like to have them shackled, and if they're going to be defense witnesses – if it's all right with you all, we'll just shackle all our inmates. Every single one of them.

MR. HARRIS (prosecutor): Your Honor, we would respectfully, and I'm not objecting. I don't a big – I'm not arguing with the Court, but I respectfully submit to the Court this: Mr. Charles Taylor has been exceptionally cooperative with us and with his attorney. He even met with the others and all of that. To shackle him when he has done nothing and when he puts in an appearance, he shouldn't be taken down and be treated like James Montgomery and Tony Carruthers.

THE COURT: Yes, sir.

MR. HARRIS: He's not – it's not fair to him. And it's also not fair to the state. And I say that in a legal way and I think the Court --

THE COURT: I understand. And the only problem I have is that – and I understand that is that I can't have an appearance that the defense witnesses are untrustworthy and on death row and the state's witnesses aren't. You know that's the problem that I have, the perceptual.

MR. HARRIS: But my point, Your Honor, very simply . . . is this. Charles Taylor hasn't done anything to be shackled. I mean he didn't – I mean it's – he hasn't done anything and it puts an aura there that is unfair to him.

THE COURT: Yes, sir. But I'm going to tell the jury before we call anybody that every time we bring an inmate in, we're going to shackle them and it says nothing about the inmate. It's just the rule of criminal court. That we have this rule.

MS. SKAHAN (Thompson's attorney): Just for the record, Judge. I mean, of course, man has escaped. But for the record, we don't object to him coming in without shackles. And if your Honor sees fit to only shackle Carruthers and Montgomery, we don't have a problem with that.

THE COURT: Maybe Mr. Mc – whatever his name is. McGlowan?

MS. SKAHAN: Sydney McGlowan?

THE COURT: Can we let them shackle whoever they want to as long as we don't shackle your –

MS. SKAHAN: As long as it's not only our defense witnesses. Because I don't think all of them need to be shackled.

THE COURT: Okay. All right. So at this point, it's not an issue. All right. If it becomes an issue, let me know it and we'll start shackling people.

After the state had finished its case-in-chief, Thompson's attorney raised the issue of

shackled witnesses again:

MS. SKAHAN: Judge, if I could address you about, I think a very important matter. I just went back and talked with our first two witnesses, who are inmates. They are in on nonviolent offenses. They are shackled.

THE COURT: Yes, ma'am.

MS. SKAHAN: And the state's witnesses, one person convicted of murder in the first degree and serving a life without parole sentence, came in here without shackles. And another man who is facing murder in the first-degree and numerous other charges, who has, in fact, escaped, was not brought in here in shackles. And that's a huge difference. The jury's going to think our witnesses are these dangerous people testifying for the defense, and obviously we can't trust them to behave in the courtroom. And I object to that.

THE COURT: Okay. Now we had a discussion of this a few days ago, and I brought it up voluntarily. And at that time you said you didn't care.

MS. SKAHAN: I said either everyone shackled or no one shackled.

THE COURT: Okay. That wasn't the discussion.

MS. SKAHAN: Judge, I did not say I don't care. We were discussing either shackling everybody I thought or no one.

-9-

THE COURT: Well, and then everyone said it didn't make a difference to them. And I believe you stated on the record you didn't care whether or not the state's witnesses were shackled.

MS. SKAHAN: What I didn't care about was whether Tony Carruthers and James Montgomery were shackled. I thought that would be a good idea. And that's what I recall if I said I don't care. And I think I did, was about Tony Carruthers and James Montgomery.

THE COURT: Okay. Okay.

MS. SKAHAN: That they probably need to be shackled.

THE COURT: Mr. Harris?

MR. HARRIS: Your Honor, the Court's memory is, of course, a lot better than mine. But if I remember right, Your Honor, the concern that the Court initially had was because of threats to disrupt the proceedings of the Court that had been transmitted. These came from certain witnesses. And I think we get to a point, Your Honor, where who – the question then becomes, who is in charge of security? And I know the state is not. But all I'm saying is this, is this when these people are being brought in, the Sheriff's Department and the Sheriff's Deputies, they have a responsibility. And I think that's what they're trying to do is to exercise that responsibility in a good way, and in a way that will not endanger anyone. And I submit to you that it's better to err on the side of safety than to be flippant and let things happen. And these people are acting because of things – they're not saying arbitrarily all the defense witnesses will be shackled. What they're doing is they're reacting to a situation that has occurred. It's well documented. It began when these people were subpoenaed. It began when they appeared in the jail. It began – and it's gone on through, and statements that they've made, and I don't think there's any use in me rehashing all of that. But I think that that is a very real interest, and a very real responsibility for the Sheriff's Department to carry these things out. And I think they should be allowed to do their job. The Court can enter a curative instruction to tell the jury to disregard it. And you can handle it. It's been done in other cases. I've tried defendants Your Honor that – I tried defendants who have been shackled because of their own --

THE COURT: Sure.

MR. HARRIS: And that's --

-10-

THE COURT: Well, the reason I brought it up ahead of time is I was going to shackle all the witnesses. And I was told nobody cared. So I didn't shackle the State's witnesses. And now that's causing problems. Yes sir?

MR. OZMENT: (Jackson's attorney): If I may, Your Honor, I think it's clear as far as the defense is concerned, our concern was certainly, we didn't care if Carruthers and Montgomery were shackled. I don't think there's any doubt about those two individuals, the dangerousness, the whole fiasco in Division Five in that trial. I don't think there's any question about that. And I think that's what we – we have no problem with that.

THE COURT: All right.

MR. OZMENT: Your Honor, the concern is that here we are, the State's witnesses don't have to be shackled no matter what they're convicted of, yet the defense witnesses do. If these people are in on non-violent offenses, Your Honor, and thing of that nature, there is no reason for them to be shackled. And Your Honor, the state's – I think what the state considers a threat or something like that, Your Honor, I think is evidenced by what's on those tapes that you listened to yesterday, Your Honor. And if they have some proof --

THE COURT: Mr. Ozment, what I consider a threat is we've had statements made over the telephone by inmates. Just wait. I'm going to make Division Eight an absolute circus when we go to trial. Now some of the witnesses that were subpoenaed in this case, Mr. McGlowan is going to be shackled. No question. Carruthers and Montgomery are going to be shackled. And if there's anybody else the Sheriff's Department thinks needs to be shackled, we can. The problem that I have is that in order, because we wanted a lot of these people shackled, that's why on the front end I said, all right, we'll shackle everybody. And I was told, basically, it's a nonissue. We don't care. So here's what we'll do then. We will shackle Mr. Carruthers and Montgomery if they're called. We'll shackle Mr. McGlowan. Whatever his name is. The one starting with "M-C."

MS. SKAHAN. Sydney McGlowan.

THE COURT: And if there is anyone else that the Sheriff's Department feels needs to be shackled for different reasons, let me know, and we will have a hearing on it.

MS. SKAHAN: Sure. Sure. That's fine. Thank you, Judge.

Following that colloquy, the court informed the jury that some witnesses would appear in shackles and instructed the jury that any restraints should not bear on the witnesses's credibility.

In this case, the court was justifiably concerned about maintaining order and about the security of those present in the courtroom, because the record indicates that inmates had made threats to disrupt the trial. The court held two hearings out of the presence of the jury before allowing the Sheriff's Department to shackle any witnesses. Furthermore, although Thompson's brief states that "ultimately, most of the defense witnesses were shackled," the record is unclear which witnesses were actually shackled.[3] Finally, we are satisfied that any prejudice was cured by the court's extensive curative instruction. See State v. Larry David Reeves and George Edwin Hardin, CCA No. 3, Lauderdale County, 1989 WL 73005, *5 (Tenn. Crim. App. at Jackson, Jul. 5, 1989). Although the trial judge remarked that it would "leave security up to the security people," the comment was made during the curative instruction and simply implied that the presence or absence of shackles was not a comment on the witnesses' character by the court.

Finally, Thompson has failed to demonstrate how he has been prejudiced by the court's order that the defense witnesses enter through a different door than the state's witnesses. The record indicates that the court's ruling was an effort to maintain security while complying with defense requests to minimize that security's impact on the jury. Indeed, in denying Thompson's request that the defense witnesses be brought through the same door as the state's witnesses, the court remarked as follows (out of the presence of the jury):

> Just so everybody else will know, also one of the reasons that we brought the state's witnesses through the back door is because we did not want to bring them in front of the two defendants in this case, because of fears of threats or intimidation, whether or not true. And we have, when they come in the courtroom, we have a lot of back up in the halls that we didn't want the jury to see because the defense doesn't want the jury to see a lot of security and be scared. For the same reason, we have a lot of DRT teams bringing up the defendants. We don't allow the jury to see them. So what we're trying to do is just keep anybody from being killed or hurt. And all anybody has to do is just create a big disturbance, and I know – I know everybody – that the defense will be asking for a mistrial, and I'm just not going to allow it to happen.

Moreover, while the record indicates that the defense witnesses entered through a different door than the state's witnesses, nothing in the record verifies Thompson's assertion that he suffered any prejudice as a result.

This issue is without merit.

## Prior Threats

Both defendants assert that the trial court erred in refusing to allow Sandra Taylor to testify that her husband had been threatened by two other inmates, Tony Carruthers and James Montgomery, shortly before he was killed. Prior to trial, the court held that the offered testimony was inadmissible hearsay.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c).

---

[3] In fact, it appears from the record that only three defense witnesses were shackled.

Similarly, testimony by the victim's wife that the victim told her that someone threatened him would have been hearsay if offered to prove the truth of the statement. Thus, the victim's wife's testimony that the victim told her that he received other threats is hearsay without an exception. See Tenn. R. Evid. 805.

We also note that this ruling did not prohibit the defense from offering evidence that the victim had previously been threatened by other inmates. Several witnesses, including James Montgomery himself, testified that Mr. Montgomery had threatened the victim in the past, but the jury apparently assigned little weight to that evidence.

This issue is without merit.

## Dying Declarations

Similarly, both defendants claim the trial court erred by excluding declarations made by the deceased shortly before his death. Specifically, the defendants claim that Officer Joseph Poindexter, who arrived at the murder scene shortly after Sergeant Taylor was shot, heard Sergeant Taylor repeat the name "Carruthers" several times. The defendants argue that the statements constituted a dying declaration, and as such they should have been admissible as an exception to the hearsay rule under Tenn. R. Evid. 804(b)(2).

We need not decide whether the requirements of Tenn. R. Evid. 804(b)(2) have been met, however, because Officer Poindexter never understood what Sergeant Taylor said. At a jury-out hearing, Officer Poindexter testified that he was the first officer to arrive at the scene. He told the court that he heard Sergeant Taylor mumble something but was unable to understand the mumbling. He testified that Sandra Taylor then told him that Sergeant Taylor had said the name "Carruthers." Mrs. Taylor's interpretation of her husband's statement, repeated by Officer Poindexter, was hearsay without an exception. See Tenn. R. Evid. 805.

This issue is without merit.

## Previously Marked Exhibits

Next, Thompson claims that the trial court erred by allowing the introduction of exhibits that had been previously used in the trial of Charles Golden. He claims that the exhibits were prejudicial because they still contained exhibit stickers from the previous trial and thus allowed jurors to "wonder what the previous hearing concerned."

Other than physical evidence and a crime scene diagram, only four photographs, of fifty introduced, were used in a previous trial. Tags indicating that the photographs had previously been exhibits were attached to those photographs. However, no other information is provided on the exhibit tags. Thus, the jury did not know where or how the exhibits were used previously, the name of any other defendant, or the outcome of any hearing. In short, even if any prejudice resulted from the use of the exhibits, such prejudice was slight and did not substantially outweigh the probative value of the photographs. See Tenn. R. Evid. 403.

## Conflict of Interest

Thompson next asserts that James Ball, one of Verico Jackson's attorneys, had a conflict of interest that prejudiced Defendant Thompson. Mr. Ball had previously represented Marcus Daniels, a state rebuttal witness, in a criminal trial; Mr. Daniels was convicted and received a life sentence.

Thompson claims that Mr. Daniels may have been angry at Mr. Ball and implies that Mr. Daniels' testimony may have been changed as a result of that anger. Defendant Thompson also claims that the state disingenuously claimed that Marcus Daniels would not be called and then called Mr. Daniels to testify on rebuttal.

Prior to trial, Mr. Ball informed the court of the potential conflict, and Defendant Jackson waived any objection. While it is true that, regarding an ineffective assistance of counsel claim, prejudice is presumed if an attorney actively represents conflicting interests, Cuyler v. Sullivan, 446 U.S. 335, 349-50, 100 S. Ct. 1708, 1716-19, 64 L. Ed. 2d 333 (1980); State v. Thompson, 768 S.W.2d 239, 245 (Tenn. 1989), the conflict in this case concerned Jackson, not Thompson. Furthermore, Thompson's allegations that Mr. Daniels' testimony may have been tainted are not supported by the record. Any allegation that Mr. Daniels' testimony was influenced by anger at Mr. Ball is pure speculation and cannot form the basis for the grant of a new trial to Defendant Thompson.

This issue is without merit.

## Mistrial

Next, both defendants argue that the trial court erred by refusing to declare a mistrial after Marcus Daniels testified. Before the state called Mr. Daniels as a rebuttal witness, the court held a jury-out hearing to determine the substance of Mr. Daniels' testimony. During the hearing, it became clear that Mr. Daniels was aware of several specific crimes that Defendant Thompson had ordered. Following the hearing, the court ruled that the state could elicit testimony about Defendant Thompson's rank within the gang and whether he gave orders to commit "gang activity," but that the witness could not testify about specific crimes that Defendant Thompson had ordered or committed. However, Mr. Daniels violated the court's order during his direct testimony:

MR. KITCHEN (Assistant District Attorney): And did the defendant, Charles Thompson, give out orders to commit gang activity?

MR. DANIELS: As far as murders, etc., yes sir.

Following that colloquy, both defendants immediately moved for a mistrial. The trial court denied the motions but immediately gave the jury an extensive curative instruction and polled each juror to insure that each juror understood the instruction.[4]

---

[4]The court gave the following curative instruction:

All right. Ladies and gentlemen, we have a situation here where you need to understand I'm going to go ask you to use this particular evidence only for a certain thing. This witness is being put on in an attempt by the state to show the nature of the Vice Lords and Charles Thompson's position in it. And we voir dired you all about gangs and what you thought about gangs and whether or not they were criminal organizations or social organizations. Things like that. This witness is only to be used for testimony about vice lords and about whether or not Mr. Thompson has a position in it. Apparently Mr. Verico Jackson is not implicated at all in this because he doesn't understand or doesn't know anything about Mr. Verico Jackson.

So this testimony, first, is only to be used as to Mr. Thompson. Secondly, it may be that you will get the implication from this testimony that if a gang commits a crime, and Mr. Thompson was

(continued...)

-14-

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994); State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such by the trial judge." Millbrooks, 819 S.W.2d at 443; see also Jones, 15 S.W.3d at 893. We find that the trial court did not abuse its discretion here, especially given that the trial court took immediate steps to prevent undue prejudice to the defendant. See State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)(holding that a mistrial was not required following a witness's outburst where the trial court took immediate action to dispel prejudice); see also State v. Mathis, 969 S.W.2d 418, 422 (Tenn. Crim. App. 1997)(holding that "[i]n light of the limited nature of the offending testimony and the trial court's prompt curative instruction, the trial court did not abuse its discretion in refusing to grant a mistrial"). This issue is without merit.

---

[4](...continued)

in charge of that gang, that Mr. Thompson committed other crimes, other than are on trial here. Now you shouldn't make that inference. If you did make that inference, in no way could you use that to show that Mr. Thompson probably committed this crime, because he had committed another crime. Does everybody understand that?

For instance, if we were trying a case of shoplifting and somebody put on proof that two months ago this same defendant committed a shoplifting somewhere else, you couldn't use that to show that he committed this crime. Otherwise the police would go out and if they found somebody committed a crime, let's say a house burglary, and then there were several more burglaries, they could just arrest that person for all the burglaries and charge him with all of them and tell the jurors he committed one, and he would be convicted even though there was no proof. Do you all understand that?

So for that reason, if there is testimony which would make you think there might be an inference that Mr. Thompson committed other crimes, you have to completely exclude that from your mind. And I'm going to have a charge at the end of my trial that 's going to say that if you find a defendant has committed another crime or crimes, you cannot use that against that defendant for any reason in this trial to show they committed the crime that is on trial today. Does everybody understand that?

When we have trials involving gangs, there's always going to be some kind of inference that a gang is, as we talked about on voir dire, some people think that gangs are crooked or they commit crimes or they sell drugs or whatever is going on. And it's necessary for the state to be allowed, if they can, as part of their theory, to prove, to try to prove to you beyond a reasonable doubt that Mr. Thompson was a high official in this gang, to show their theory.

To the same extent, though, if they did prove that to you, you can't use that to say, well, Mr. Thompson committed other crimes as head of a gang, because gangs commit crimes, and so we're going to convict, not because the state has proved he's guilty beyond a reasonable doubt. We've only convicted him because he probably did it, because he did other things.

Do you see how that could be unfair to Mr. Thompson? So you need to understand that even though this witness is testifying to gang activity and he's testifying or may testify that Mr. Thompson held a high position in the gang, you can't use any other crimes that the gang may have committed against Mr. Thompson. In other words, that's not an element of the offense and can't be used against him. Can you all do that? All right.

**Extrinsic Evidence of Prior Inconsistent Statements**

Thompson claims that the trial court erroneously excluded extrinsic evidence of Charles Taylor's prior inconsistent statements. On cross-examination, Charles Taylor was asked whether he had ever told other inmates that he must "find some way to get out of this time you're facing." Mr. Taylor denied ever making a statement to that effect. However, later, during a jury-out hearing, Mr. Wilkinson offered to testify as follows:

> Because he [Charles Taylor] would always come to cry about his time like, man, I hope they don't give me this or I hope they don't give me that or I hope they don't give me life or whatever. If I can get me a, you know, if I can get up out of here, I will take the first train going. Things like that or he wish they would give him a fifteen-year sentence or things like that.

After the hearing, the trial court held that Mr. Wilkinson could not be asked about Mr. Taylor's statements, because they were not inconsistent with Taylor's answer to the question he had been asked and therefore were not prior inconsistent statements:

> You can ask him whether or not Charles Taylor made statements to him about, you know, how he would like to get out of his charges, but you – we can't go into the substance of those statements. Mr. Taylor said on cross-examination, when he testified, that . . . he was asked . . . haven't you told inmates you would do anything to get out of these charges. I haven't heard that from this witness. And so we can't ask him that.

Rule 613 of the Tennessee Rules of Evidence provides, in relevant part, "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). Furthermore, the trial court's assessment of whether a statement is inconsistent will only be overturned if the trial court abused its discretion. Davis v. Hall, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995).

The statements made by Taylor on cross-examination and those about which Wilkinson testified above are not inconsistent. Although a statement need not directly contradict a proposition in order to be inconsistent, the extrinsic evidence must have a tendency to discredit the testimony of the witness. See generally, Neil P. Cohen, et al., Tennessee Law of Evidence § 613.3 (4th ed. 2000). While Mr. Taylor denied telling other inmates that he would find a way to reduce or evade his sentence, Mr. Wilkinson's testimony merely indicated that Mr. Taylor had complained about the sentence he was facing and hoped for as little time as possible. It is noteworthy that, following the court's ruling, Thompson's defense attorney remarked "[w]e have other witnesses. That's fine." However, no other witness ever contradicted Mr. Taylor's testimony. We find no abuse of discretion.

This issue is without merit.

## Opinion and Reputation Evidence of Character

Next, Thompson claims that the trial court erred by excluding evidence that state witness Charles Taylor had a reputation for being untruthful. Out of the presence of the jury, witness Mark Wilkinson offered to testify that state witness Charles Taylor had a reputation within prison pod 4-f for untruthfulness. The court held that Mr. Wilkinson and subsequent witnesses from prison pod 4-f could testify as to their opinions of Charles Taylor's character for truthfulness, but that they could not testify as to Charles Taylor's reputation for truthfulness because the prison pod was "not a representation of our community."

We disagree with the trial court that a prison pod may not be considered a "community" for purposes of reputation evidence. Rule 608(a) provides, in pertinent part, "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness . . . ." Tenn. R. Evid. 608(a). "Although the rule does not specifically speak to the issue, testimonial character evidence pertaining to another witness's character for truthfulness is admissible only if a proper foundation is established." State v. Dutton, 896 S.W.2d 114, 118 (Tenn. 1995)(citations omitted). "[I]t is necessary to qualify the reputation witness 'through a showing of such acquaintance with the [person under attack], the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded.'" Id. (quoting United States v. Watson, 669 F.2d 1374, 1381 (11th Cir. 1982)). In other words the offering party need only show that the witness has the necessary knowledge of the person's reputation, based on sufficient experience with the person in that person's community.

A community is defined as "a body of people living in the same place under the same laws." The Merriam Webster Dictionary, 1994. That community need not, as the trial court suggested, be representative of society as a whole or even of the community in which the person normally lived. Of course, membership in a common community alone might not satisfy the foundation requirement. As noted above, the witness must also demonstrate that he was acquainted with the person's reputation within the community.

Accordingly, we find that the trial court's limitation on the witnesse's testimony was erroneous. However, the error was harmless, because the court did allow other witnesses who had been in pod 4-f to testify as to their opinions of Charles Taylor's character for truthfulness, and those opinions were unfavorable. Thus, Thompson suffered no prejudice because Charles Taylor's reputation for truthfulness within the community of prison pod 4-f was apparent to the jury despite the court's ruling as to Wilkinson.

This issue is without merit.

## Jury Instructions

Next, Thompson claims that the trial court erred by denying his request for a special jury instruction. Thompson requested that the court instruct the jury that "the facts must exclude every other reasonable theory hypothesis beyond a reasonable doubt except the guilt of the defendant." Instead, the trial court charged the jury as follows:

> You must find all the essential facts are consistent with the hypothesis of guilt, as that
> is to be compared with all the facts proved. The facts must exclude every other

reasonable theory or hypothesis except that of guilt.  And the facts must establish such a certainty of guilt of the defendants or either of them, as to convince the mind beyond a reasonable doubt that the defendant or either of them are the ones who committed the offense.

These instructions were taken from the Tennessee Criminal Pattern Jury Instructions, 42.03, and are accurate statements of the law regarding circumstantial evidence. <u>Marable v. State</u>, 203 Tenn. 440, 313 S.W.2d 451, 456-57 (1958).  Where the trial court's instructions on a matter are proper, its denial of a special request is not error. <u>State v. Vann</u>, 976 S.W.2d 93, 114 (Tenn. 1998).

This issue is without merit.

<u>**Sentencing**</u>

Finally, Thompson claims that he was prejudiced at sentencing because the trial court allowed the state to introduce "more proof than was necessary to prove his prior convictions for violence."  At sentencing, Thompson moved the trial court to limit the state's proof to a listing of the elements of the prior crimes and objected to the introduction of the indictments for Thompson's prior crimes because other names were listed on the indictments.  Alternatively, Thompson offered to stipulate that the prior crimes were violent.  The trial court ruled that the state could introduce the indictments (redacted to eliminate others' names) to prove that the prior crimes for which Thompson had been convicted had elements of violence to the person, but ordered the state not to inquire into the specific facts of the crimes.  Thompson now claims that the indictments had little probative value and were highly prejudicial at sentencing.

Tenn. Code Ann. § 39-13-204(i) provides

No death penalty or sentence of imprisonment for life without possibility of parole shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which are limited to the following:

. . . .

(2) the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person.

Thus, the state was required to prove that the defendant had committed one or more prior violent felonies. Because the indictments in this case did little more than recite the statutory elements along with the defendant's and the victim's names, we find that Thompson was not prejudiced by their introduction.  This issue is without merit.

Accordingly, the judgment of the trial court is AFFIRMED.

_____

JERRY L. SMITH, JUDGE